IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| FIKE'S DAIRY, INC. formerly known as ) | |
| R. BRUCE FIKE & SONS DAIRY, INC., ) | |
| Appellant, ) | 2:08-cv-662 |
| v. ) | |
| ) | |
| NATALIE LUTZ CARDIELLO, Chapter 7 ) | |
| Trustee for the Estate of Dairy Consulting, ) | |
| Inc., ) | |
| Appellee, ) | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is an appeal from the order of the Bankruptcy Court dated April 9, 2008 filed by Fike's Dairy, Inc. ("Fike's"). Fike's filed a comprehensive brief in support of its position (Document No. 5), appellee Natalie Lutz Cardiello, the Chapter 7 Trustee for the Estate of Dairy Consulting, Inc. ("DCI") filed a brief in response (Document No. 6), Fike's filed a reply brief (Document No. 7), and the appeal is ripe for disposition.

The underlying decision of the Bankruptcy Court was set forth in a thorough, 65- page Memorandum Opinion dated April 9, 2008. Although the April 9, 2008 Order granted DCI's motion for partial summary judgment, it constituted an appealable final order because all other issues had been resolved by stipulation of the parties.

Fike's recognizes that the underlying facts are not in dispute. Instead, Fike's presents the following legal issues in this appeal: (1) whether DCI's claim to consulting fees survived the November 2002 termination of the contracts that gave rise to the claim such that DCI's claim remained viable through February 2004; (2) whether the consulting fees that would have been paid to DCI but for the lack of consent from Fike's principal lender, Congress Financial Corporation ("Congress"), became due and payable when Congress's debt was repaid; and (3)

whether Fike's parent corporation, Protein Holdings, Inc. ("Protein Holdings"), could qualify as a "principal lender" within the meaning of the Marketing Consulting Agreement ("MCA") and related Letter Agreement, such that it could withhold consent for payment to DCI.

Factual Background

At all relevant times, Fike's was in the business of manufacturing and distributing dairy products. On May 28, 1997, Fike's purchased the assets of Taylor Milk Company from Joseph S. Taylor, III. Taylor Milk Company became a 45% shareholder in Fike's and Taylor acquired a seat on Fike's Board of Directors. Simultaneously, Fike's entered into a consulting agreement (the MCA) with DCI, a company organized at the time of the transaction and wholly owned by Mr. Taylor. Pursuant to the MCA, Fike's agreed to pay DCI a consulting fee commencing on July 1, 1997, the payment terms of which were set forth in a Letter Agreement.

The Letter Agreement, also dated May 28, 1997, provided: "As compensation for the management services provided pursuant to the [MCA], each year during the term of the [MCA], Fike shall pay to DCI or its assignes a consulting fee (the "Consulting Fee") in the amount of $500,000 per year." The Letter Agreement further set forth a procedure for making payments via monthly draws and for resolving any outstanding balance. Both the monthly draw and the unpaid balance refer to the approval of Fike's principal lender. Specifically, the Letter Agreement states: "The amount of ... DCI's draw ... shall be dependent upon the maximum monthly amount of consulting fee distribution ("MMA") **approved by Fike's principal lender (currently Congress Financial Corp.)** (Emphasis added). Similarly, the Letter Agreement provides: "Any portion of the Consulting Fee for a fiscal year which is not paid in the form of the DCI Draw shall be due

and payable August 15 following the end of the fiscal year, ***subject to the approval of Fike's principal lender***."[1]  (Emphasis added).  The Letter Agreement also states: "If the amount paid to DCI is less than the amount due to it then an amount equal to such deficit shall be posted to a 'DCI Due To' account."

From July 1, 1997 through October 31, 2000, Fike's paid all sums due to DCI under the MCA, presumably with the approval of Congress.  Starting in November, 2000, Fike's stopped paying the consulting fees to DCI.  On October 31, 2002, the MCA terminated by its terms due to the reacquisition of Taylor's stock by Protein Holdings.  In February 2004, the loans made by Congress to Fike's were repaid as part of a transaction in which Fike's sold substantially all of its assets to United Dairy and ceased operations.  At oral argument in the Bankruptcy Court, Fike's counsel informed the judge that there was no independent lender after Congress was repaid, but argued that Protein Holdings became the "principal lender" by virtue of the large amounts of money it had loaned to Fike's in the past.

The time period for which consulting fee payments are at issue is from November 1, 2000 through October 31, 2002.  Fike's does not dispute that DCI performed all of the services that were contractually required of it under the MCA.  Fike's never received permission from Congress to pay consulting fees to DCI for this period.

The amount of fees claimed by DCI is not in dispute.  Fike's consolidated financial statement for the nine months ended March 31, 2002[2] listed a liability for "Marketing and

---

[1] The parties and the Bankruptcy Court used the phrase "Lender Approval Clause" to refer to these portions of the Letter Agreement.  The Court will use the same terminology.

[2] As Fike's correctly notes, the consolidated financial statement was filed prior to the termination of the MCA, and therefore, is not inconsistent with its current legal position.

consulting fees (unsecured)" to DCI of $887,000. From March 31 through October 31, 2002, Fike's accrued an additional 7/12th of the annual fee, or $291,666. Thus, DCI claims entitlement to consulting fees totalling $1,178,666.[3]

Legal Analysis

Fike's reasons as follows: (1) the Letter Agreement clause "subject to the approval of Fike's principal lender" creates a condition precedent that must be fulfilled before Fike's obligation to make payment to DCI arises; (2) from November 2000 through November 2002, Congress was Fike's "principal lender" and Congress never gave consent to payment of DCI's consulting fees, during the time period or afterwards; (3) the parties' agreement terminated on November 2, 2002, before the condition precedent was fulfilled, and thus, the consulting fees never became payable; and (4) once the agreement terminated without fulfillment of the condition precedent, it could not be revived by later events. Fike's reasons in the alternative that even assuming, arguendo, that DCI's claim survived the contract termination, Protein Holdings became its principal lender and continued to withhold consent to pay DCI. Thus, Fike's contends that it has no obligation to pay any additional consulting fees to DCI.

DCI contends that Fike's duty to pay consulting fees had accrued and its liability was absolute. DCI interprets the Lender Approval Clause to mean that Fike's principal lender could postpone, but could not permanently avoid, payment of the consulting fees. DCI argues that a

---

Similarly, the deposition testimony of Whitcomb Gallagher cited by DCI occurred prior to termination of the MCA.

[3] After crediting an offset asserted by Fike's, the Bankruptcy Court entered judgment in DCI's favor in the amount of $926,217.56, plus 6% interest from March 1, 2004.

4

balance owed under a contract is not extinguished at the expiration of that contract. DCI reasons that the obligation became fully payable at the latest on February 29, 2004 when Congress was repaid, as Fike's no longer had a "principal lender" that could withhold consent to payment. DCI further contends that Protein Holdings cannot be a "principal lender" as contemplated in the parties' agreement because it was the parent corporation of Fike's, which would enable Fike's to exercise control over its own duty to pay. DCI argues generally that the analysis of the Bankruptcy Court was correct.

In summary, the Bankruptcy Court reasoned that the Lender Approval Clause unambiguously does not create a condition precedent as Fike's contends, but instead describes an event the occurrence of which marks the time when Fike's would have to satisfy what then constituted fixed, existing indebtedness on its part to DCI with respect to consulting fees. The Bankruptcy Court then concluded that the Lender Approval Clause became inoperative if, and when, Fike's ceased to have a principal lender. The Bankruptcy Court rejected Fike's argument that Protein Holdings became the principal lender, concluding that the contractual language unambiguously referred to an outside, independent entity which was not affiliated with Fike's. The Court will address these issues seriatim.

Was the Lender Approval Clause a Condition Precedent?

In determining that lender approval was not a condition precedent to the accrual of indebtedness to DCI, the Bankruptcy Court pointed to ¶ (a) of the Letter Agreement, which establishes an unqualified obligation that Fike's "shall pay to DCI" consulting fees of $500,000 per year. Similarly, the Letter Agreement provides that unpaid sums must unconditionally be posted to a "DCI Due To" account. The Bankruptcy Court further noted that ¶ (b), in which the

5

Lender Approval Clause is located, deals exclusively with the method of payment and the manner in which Fike's would satisfy its obligation. Thus, the language of the Letter Agreement indicates that Fike's debt to DCI is unconditional. The Bankruptcy Court observed that, at a minimum, the Lender Approval Clause did not satisfy the rule in Pennsylvania that a condition precedent to an obligation must be expressed by clear language. *Mellon Bank, N.A. v. Aetna Business Credit, Inc.*, 619 F.2d 1001, 1016 (3d Cir. 1980).

This Court agrees that the Lender Approval Clause is not a condition precedent to accrual of the debt, but only relates to the timing of payment of that debt. Fike's had a contractual duty to pay DCI consulting fees of $500,000 per year. It bears repeating that Fike's accepted DCI's performance of consulting services during the entire life of the MCA. It would be commercially unreasonable to interpret the Letter Agreement in such a way that DCI would have agreed to provide services in the mere hope that a third-party lender might later approve payment for those services. It is much more reasonable to interpret the Lender Approval Clause as solely a timing mechanism. In sum, Fike's owes a debt to DCI in the amount of the unpaid consulting fees.

<u>Was Approval from a Principal Lender Necessary to Make the Debt Payable?</u>

Fike's next argument is that even if it owed a debt to DCI, it did not breach the contract because the debt never became payable in that no "principal lender" ever approved payment. Fike's contends that because the MCA terminated before lender authority was obtained, the condition precedent was never satisfied and Fike's was permanently relieved from having to pay the debt.[4]

---

[4]Fike's Reply Brief focuses on this aspect of the analysis, citing *Boase v. Lee Rubber & Tire Co.*, 437 F.2d 527, 532 (3d Cir. 1970) (involving an employer's clear and unambiguous contractual right to terminate a pension plan). In *Boase,* an entity (the employer) existed that was

In essence, the Bankruptcy Court concluded that explicit lender approval was unnecessary. The Bankruptcy Court explained that contracts will not be construed to result in a forfeiture unless no other reasonable construction is possible, *Kalina v. Eckert*, 497 A.2d 1384, 1385 (Pa. Super. 1985). The Bankruptcy Court concluded that Fike's proposed construction of the Lender Approval Clause was patently unreasonable because it would allow Fike's to escape payment indefinitely. The Bankruptcy Court further noted that the Lender Approval Clause was inserted in the Letter Agreement for the sole purpose to protect the principal lender, Congress, rather than to protect Fike's. Thus, it concluded that by at least February 29, 2004, when Fike's ceased to have a principal lender, the Lender Approval Clause became inoperative and Fike's had a duty to immediately pay the outstanding debt to DCI.

This Court agrees with the practical and reasonable result reached by the Bankruptcy Court. As explained above, Fike's debt to DCI had accrued and the Lender Approval Clause is solely a timing mechanism. The question then is whether the phrase "subject to the approval of Fike's principal lender" should be construed to place an affirmative burden on DCI to *obtain* approval for payment from Fike's lender or to place the burden on Fike's to demonstrate that its lender had *withheld* approval for payment. The latter interpretation is far more realistic and commercially reasonable. Fike's was better-positioned to interact with its principal lender and DCI had no control over whether a "principal lender" existed. Thus, the arguments of Fike's regarding post-termination satisfaction of contractual conditions and revival of duties is misplaced. There was no need for DCI to satisfy or revive the conditions necessary to trigger

---

entitled to (and did) exercise an unambiguous contractual condition. In this case, at least after February 29, 2004, no lender refused to approve payment to DCI. Indeed, Fike's no longer had a principal lender and therefore no entity could invoke the Lender Approval Clause.

payment – rather, Fike's had a continuing duty to maintain the conditions for withholding such payment. Thus, the Court concludes that Fike's debt to DCI became payable at least as of February 29, 2004, when Fike's no longer had a "principal lender" that could withhold approval for payment. Moreover, as the Bankruptcy Court observed, Fike's proposed construction would wipe out an otherwise valid debt to a party that fully performed under the contract and the Court is loath to conclude that the parties intended such an unlikely and unjust result.

Whether Protein Holdings Became the Principal Lender

Fike's remaining alternative argument, that Protein Holdings became its "principal lender" and continued to withhold consent for payment to DCI, does not merit extensive analysis. Fike's counsel conceded at oral argument before the Bankruptcy Court that after Congress was repaid, there was no independent lender. Thus, the narrow question is whether the term "principal lender" in the Letter Agreement can be construed to encompass Fike's parent company. The Bankruptcy Court properly concluded that the parties' agreement contemplated an outside lender who was independent of and unaffiliated with Fike's. Otherwise, Fike's would have had the practical ability to indefinitely avoid payment to DCI, a construction that would be commercially unreasonable and would result in a forfeiture.

In accordance with the foregoing, the April 9, 2008 Order of the Bankruptcy Court is **AFFIRMED** and Fike's Appeal is **DISMISSED**. The clerk shall docket this case closed.

SO ORDERED this 4th day of August, 2008.

                                                BY THE COURT:

                                                s/ Terrence F. McVerry
                                                United States District Court Judge

cc: George J. Marcus, Esquire
Email: bankruptcy@mcm-law.com

Scott Michael Hare, Esquire
Email: smhare@bartlaw.com